UNITED STATES DISTRICT COURT
DISTRICT OF MAINE

| | | |
|---|---|---|
| KATHLEEN KIMBALL, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | 1:12-cv-00076-JAW |
| | ) | |
| JOHN HOWER, JR., | ) | |
| | ) | |
| | ) | |
| Defendant. | ) | |

**ORDER ON THE DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

After the affair, Kathleen Kimball discovered she was infected with Herpes Simplex Viruses 1 (HSV-1) and 2 (HSV 2).  Claiming her former lover, John Hower, Jr., M.D., was the source of the infections, she filed suit against him for negligence and the negligent infliction of emotional distress (NIED).  Dr. Hower moves for summary judgment on both claims.  The Court first concludes that because Dr. Hower does not have HSV-1, he was not the source of her HSV-1 infection.  Next, because Ms. Kimball generated genuine issues of material fact as to whether Dr. Hower was the source of her HSV-2 infection and as to whether infecting another with a sexually transmitted disease constitutes an injury if the infected person is asymptomatic, the Court denies summary judgment on that part of her claim.  Finally, though it may have been special to them at the time, a sexual relationship between consenting adults is not a special relationship within the narrow confines of the tort of NIED and the Court grants Dr. Hower's motion for summary judgment on Count Two, the NIED count.

## I.   BACKGROUND

### A.   Procedural History

On February 7, 2010, Kathleen Kimball filed a two-count complaint against John Hower, Jr., M.D. in Maine Superior Court alleging negligent infliction of physical harm and negligent infliction of emotional distress (NIED).  *Compl.* (ECF No. 1-3).  Dr. Hower removed this case to federal court on March 6, 2012.  *Notice of Removal* (ECF No. 1).  On March 22, 2013, Dr. Hower filed a motion for summary judgment, *Def.'s Mot. for Summ. J.* (ECF No. 37-1) (*Def.'s Mot.*), and a statement of material facts in support of his motion, *Def.'s Statement of Material Facts* (ECF No. 37-2) (DSMF).  Ms. Kimball responded to Dr. Hower's motion on April 13, 2013.  *Pl.'s Resp. to Def.'s Mot. for Summ. J.* (ECF No. 44) (*Pl.'s Opp'n*).  On April 15, 2013, she filed a response to Dr. Hower's statement of facts and a statement of additional material facts.  *Pl.'s Opposing Statement of Facts* (ECF No. 46) (PRDSMF & PSAMF).  Dr. Hower responded to Ms. Kimball's opposition, *Def.'s Reply to Pl.'s Resp. to Def.'s Mot. for Summ. J.* (ECF No. 49) (*Def.'s Reply*), and filed a response to Ms. Kimball's statement of additional material facts on April 30, 2013, *Def.'s Reply to Statement of Material Facts* (ECF No. 50) (DRPSAMF).

### B.   Statement of Facts[1]

#### 1.   The Parties' Romantic Relationship

Kathleen Kimball and John Hower, Jr. met in December 2000; they started a sexual relationship in April or May 2001.  DSMF ¶ 1; PRDSMF ¶ 1.  When the

---

[1]     Keeping with "the conventional summary judgment praxis," the Court recounts the facts in the light most hospitable to Ms. Kimball's case theories consistent with record support.  *Gillen v. Fallon Ambulance Serv., Inc.*, 283 F.3d 11, 17 (1st Cir. 2002).  Accordingly, the Court recites supported facts as true even if Dr. Hower disputes them.

parties met, Ms. Kimball was a forty-six year old Patient Account Manager for Maine General Health Associates. DSMF ¶ 2; PRDSMF ¶ 2. She had been a widow since 1999, after having been married with a child for twenty-two years.[2] DSMF ¶ 2; PRDSMF ¶ 2.

When Dr. Hower first met Ms. Kimball, he was a fifty-six year old doctor practicing vascular surgery.[3] DSMF ¶ 3; PRDSMF ¶ 3. Dr. Hower was in the process of his third divorce, which was finalized in June 2001; however, Ms. Kimball understood when they met that he was already divorced. DSMF ¶ 3; PRDSMF ¶ 3. The parties maintained an intimate relationship until the latter part of 2008, and they continued to have a non-sexual relationship until they resumed a sexual relationship in 2010.[4] DSMF ¶¶ 4, 8; PRDSMF ¶¶ 4, 8. The parties did not have any sexual relations between the end of 2008 and March 2010 due in part to Dr. Hower's health issues.[5] DSMF ¶ 5; PRDSMF ¶ 5.

---

[2]     Ms. Kimball imposed a qualified response to paragraph 2 because she and her husband had one child, not "children." PRDSMF ¶ 2. As her qualification is supported by the record, the Court includes it. *See Dep. Tr. of Kathleen Kimball* at 10:2-11:11 (ECF No. 17-3) (*Kimball Dep.*).

[3]     Ms. Kimball interposed a qualified response to paragraph 3 because she "understood from Defendant when they met that he was divorced." PRDSMF ¶ 3. Viewing the facts in the light most favorable to Ms. Kimball and as Dr. Hower's record citations do not contradict her qualification, the Court includes it.

[4]     Ms. Kimball denied paragraph 4 "only to the extent [the] statement states or implies that the parties' relationship ended in 2008." PRDSMF ¶ 4. Because the record supports Ms. Kimball's denial, the Court clarifies that the parties "continued to have a non-sexual relationship thereafter until they resumed a sexual relationship in 2010." *Kimball Dep.* at 25:19-27:9; DSMF ¶ 8; PRDSMF ¶ 8.

[5]     Ms. Kimball interposed a qualified response to paragraph 5 noting that the parties' sexual relationship was interrupted in part because of Dr. Hower's health issues and she otherwise denied the statement insofar as it signals that their relationship as partners ended during that period. PRDSMF ¶ 5. Because Ms. Kimball's qualification is supported by the record citation, the Court includes it but does not separately address Ms. Kimball's denial because it is subsumed by paragraph 4. *See Kimball Dep.* at 26:8-27:18.

During their relationship, the parties got along very well and there was no fighting out loud or animosity; however, Ms. Kimball considers Dr. Hower to have a volatile temper and was scared by it at times.[6]  PSAMF ¶¶ 10, 66; DRPSAMF ¶¶ 10, 66.  Sometimes Dr. Hower got loud and spoke angrily toward Ms. Kimball or at other people in her presence.  PRDSMF ¶ 10.  There was no domestic violence in the parties' relationship, but on one occasion, Dr. Hower slammed a drawer shut in anger barely missing Ms. Kimball's fingers.[7]  DSMF ¶ 11; PRDSMF ¶ 11.

## 2.      The Parties' Breakup and Continued Sexual Contact

On February 5, 2010, Dr. Hower informed Ms. Kimball that he had fallen out of love with her.  DSMF ¶ 6; PRDSMF ¶ 6.  On or about February 27, 2010, Ms. Kimball learned that Dr. Hower had recently started a sexual relationship with another woman, T.M.  DSMF ¶ 7; PRDSMF ¶ 7.  Ms. Kimball said she would leave, but Dr. Hower told Ms. Kimball he was not going to see T.M. anymore and asked Ms. Kimball to stay in the relationship, so she did.  PSAMF ¶ 68; DRPSAMF ¶ 68.

Sexual activity occurred between the parties within one week of Ms. Kimball's learning about Dr. Hower's affair and continued sporadically until December 31, 2010; their personal relationship continued until March 28, 2011.[8]

---

[6]      Dr. Hower denied paragraph 66 citing portions of the record, but did not explain his denial. DRPSAMF ¶ 66.  Because Ms. Kimball's statement is supported by the record, the Court accepts it but clarifies that Ms. Kimball's statement reflects her opinion of Dr. Hower's temper.

[7]      Ms. Kimball interposed a qualified response to paragraph 11 as "there was near violence on one occasion when [Dr. Hower] slammed a drawer shut in anger, barely missing Kathleen's fingers." PRDSMF ¶ 11.  As Ms. Kimball's qualification is supported by the record, the Court includes it.  *See Kimball Dep.* at 38:23-39-23.

[8]      Dr. Hower's paragraph 8 states:

DSMF ¶ 8; PRDSMF ¶ 8.  During their sexual relationship, Ms. Kimball and Dr. Hower did not use condoms when they had sexual intercourse.  DSMF ¶ 9; PRDSMF ¶ 9.  Ms. Kimball asked Dr. Hower about using condoms two or three times and he said that he was not worried about someone getting pregnant at her age; she accepted his judgment.[9]  PRDSMF ¶ 9.

### 3.     Ms. Kimball's Positive HSV Test Results

On February 14, 2011, during a routine doctor's appointment, Ms. Kimball had a blood test for the presence of certain viruses, including HSV-1 and HSV-2. DSMF ¶ 12; PRDSMF ¶ 12.  Her blood test results confirmed she was positive for HSV-1 and HSV-2.  DSMF ¶ 13; PRDSMF ¶ 13.  Ms. Kimball never had HSV testing before her February 14, 2011 blood test.  DSMF ¶ 14; PRDSMF ¶ 14.  She has never had any symptoms associated with genital or oral herpes.  DSMF ¶ 17; PRDSMF ¶ 17.  Ms. Kimball is also unaware of any HSV testing on her late

---

Within one week after Kathleen learned that John had a sexual relationship with another woman, Kathleen and John re-engaged in their sexual relationship, and that sexual relationship continued sporadically until December 31, 2010.

DSMF ¶ 8.  Ms. Kimball interposed a qualified response to paragraph 8 stating, "it is more accurate to say that sexual activity occurred between the parties within one week after Kathleen learned about John's affair and continued sporadically until December 31, 2010."  PRDSMF ¶ 8.  The substantive difference between these two statements of fact is unclear; however, viewing the facts in the light most favorable to the non-movant, the Court includes Ms. Kimball's version of the statement.  *Compare* DSMF ¶ 8, *with* PRDSMF ¶ 8.  Further, Ms. Kimball denied the statement in paragraph 8 to the extent that it implied "that their personal relationship as partners was not engaged prior to that time or that it had ended prior to March 28, 2011."  PRDSMF ¶ 8.  Given the inclusion of "affair" in the statement and the surrounding statements, which establish that the parties' romantic relationship was ongoing, the Court credits Ms. Kimball's denial and notes that the parties' personal relationship ended on March 28, 2011.  *See Kimball Dep.* at 25:19-25.

[9]     Ms. Kimball interposed a qualified response to paragraph 9 stating that although the parties did not use condoms during their relationship, Ms. Kimball asked Dr. Hower about using them two or three times before sexual intercourse and "she had accepted [his] judgment that they did not need to use condoms because he wasn't worried about a pregnancy at her age."  PRDSMF ¶ 9.  As the majority of Ms. Kimball's qualification is supported by the record, the Court included the supported facts in her qualification.  *See Kimball Dep.* at 19:22-20:11.

husband, David, before his death in 1999.  DSMF ¶ 15; PRDSMF ¶ 15.  The results

of her HSV blood test form the sole basis for Ms. Kimball's Complaint of contracting

sexually transmitted diseases (STDs) due to Dr. Hower's negligence.[10]  DSMF ¶ 16;

PRDSMF ¶ 16.

### 4.    Dr. Hower's Positive HSV-2 and Negative HSV-1 Test Results

On October 16, 2012, Dr. Hower underwent court-ordered blood testing.

DSMF ¶ 22; PRDSMF ¶ 22.  His test results revealed that he was positive for HSV-

2 but negative for HSV-1.[11]  DSMF ¶ 22; PRDSMF ¶ 22.  Before that test, Dr.

Hower stated that he never had blood testing to detect the presence of HSV-1 or

HSV-2; however, in an e-mail to Ms. Kimball on February 21, 2011, Dr. Hower

stated "I know that I am positive for HSV I."[12]  DSMF ¶ 23; PRDSMF ¶ 23.  All

---

[10]     Dr. Hower's paragraph 16 reads:

> The results of her HSV blood test form the sole basis for Kathleen's complaint of contracting STDs.

DSMF ¶ 16.  Ms. Kimball admitted in part and denied in part the contents of paragraph 16 on the ground that it would be incorrect to state that the "tests are the sole basis for Kathleen's Complaint that she contracted STD[s] due to John's negligence."  PRDSMF ¶ 16.  The difference between the statements is likely a matter of capitalization.  Dr. Hower did not capitalize "complaint" and his paragraph may be referring to the scientific link between her STDs and him.  In response, Ms. Kimball capitalized "Complaint" and her response may be referring to the factual basis of her legal theories against Dr. Hower.  Viewing the paragraph in the light most favorable to Ms. Kimball, the Court included her version since her theories of negligence against Dr. Hower are in fact broader than the test results.

[11]     In paragraph 48, Ms. Kimball states, "Dr. Hower said nothing to Ms. Kimball about being positive for HSV-1 prior to their becoming sexually active or before performing oral sex with her." PSAMF ¶ 48; DRPSAMF ¶ 48.  Given that Ms. Kimball admitted paragraph 22 and the Court's inclusion of her qualification in paragraph 23, the Court omits her statement in paragraph 48 because it suggests that Dr. Hower had HSV-1.  *See* PSAMF ¶ 48.

[12]     Ms. Kimball qualified paragraph 23 because Dr. Hower told Ms. Kimball for the first time in an e-mail dated February 21, 2011, "I know that I am positive for HSV 1."  PRDSMF ¶ 23.  Because Ms. Kimball's qualification is supported by the record, the Court includes it.  *See Kimball Dep.* at 93:25-94:9; *Kimball Dep.* at Exhibit 11, *E-mail from John Hower to Kathleen Kimball* (Feb. 21, 2011 10:05 A.M.) (*Hower E-mail*).

blood testing for STDs and STD-related viruses Dr. Hower had before October 16, 2012 was required by his employers and insurers and all were negative.[13]  DSMF ¶ 24; PRDSMF ¶ 24.

Dr. Hower has never had any symptoms associated with genital herpes. DSMF ¶ 18; PRDSMF ¶ 18.  He had what his mother described to him as "fever blisters" on his lip three or four times as a child and possibly during his teen years, but none since. DSMF ¶ 19; PRDSMF ¶ 19.  Other than learning of Ms. Kimball's positive HSV blood tests in 2011, Dr. Hower was never made aware that any of his prior sexual partners had genital or oral herpes or that they were positive for HSV-1 or HSV-2.[14]  DSMF ¶ 20; PRDSMF ¶ 20.  He also never saw any symptoms of genital or oral herpes on any of his prior sexual partners.  DSMF ¶ 21; PRDSMF ¶ 21.

### 5.   HSV-1 and HSV-2

#### a.   Dr. Ann Lemire

Ms. Kimball designated Dr. Ann Lemire to testify "as an expert on transmission, treatment and prevention of STDs . . . ."  DSMF ¶ 25; PRDSMF ¶ 25.

---

[13]     Ms. Kimball denied paragraph 24, citing several documents in the record.  PRDSMF ¶ 24. The Court carefully reviewed Ms. Kimball's citations and none contradicts paragraph 24. As paragraph 24 is supported by the record and Ms. Kimball's denial is not, the Court includes paragraph 24.

[14]     Ms. Kimball denied paragraph 20 "based on John's statements, including but not limited to contradictory statements under oath, and based on his and T.M.'s conduct after their notification by Kathleen of her test results and other circumstantial evidence."  PRDSMF ¶ 20.  Because Dr. Hower's statement is supported by the record and the record evidence Ms. Kimball cites does not contradict his statement, the Court includes paragraph 20 over Ms. Kimball's denial.  *Dep. Tr. of John Hower, Jr.* at 54:17-55:4 (ECF No. 17-5) (*Hower Dep.*).

Dr. Lemire is the medical director for the largest STD clinic in Maine at the Public Health Division India Street Clinic in Portland.  DSMF ¶ 26; PRDSMF ¶ 26.

### b.    Infection and Symptoms Associated with Outbreaks

Genital herpes is ordinarily caused through genital to genital contact by HSV-2, although one third of genital herpes is caused by HSV-1 through oral to genital contact.[15]   DSMF ¶ 27; PRDSMF ¶ 27.   Oral herpes (i.e. herpes of the mouth) is ordinarily caused by HSV-1.[16]   DSMF ¶ 28; PRDSMF ¶ 28.   If a person has blood testing showing antibodies for HSV-1 and HSV-2 but has never had any associated outbreaks, that person does not have genital or oral herpes, yet that asymptomatic person who has nevertheless been infected with the HSV virus,

---

[15]    Dr. Hower's paragraph 27 reads:

> Genital herpes is ordinarily caused through genital to genital contact by HSV-2, although in unusual circumstances, genital herpes can be caused by HSV-1 though oral to genital contact.

DSMF ¶ 27.  Ms. Kimball denied paragraph 27 citing pages 21 through 23 of Dr. Lemire's deposition transcript but did not otherwise state the basis for her denial.  PRDSMF ¶ 27.  In reviewing the cited portion of Dr. Lemire's deposition, Dr. Lemire states that "approximately a third [of genital herpes] are from HSV-1." *Dep. Tr. of Ann Marie Lemire, M.D.* at 21:7-12 (ECF No. 37-4) (*Dr. Lemire Dep.*).  Dr. Lemire expressly declined to characterize the sexual transmission of genital herpes as "an unusual circumstance." *Id.* 22:1-4.  Based on Dr. Lemire's testimony, the Court has not included the portion of paragraph 27 that describes HSV-1 as causing genital herpes only "in unusual circumstances" because Dr. Hower's statement is not supported by the cited portion of Dr. Lemire's testimony. DSMF ¶ 27.

Dr. Hower objected to Ms. Kimball's denial because (1) it was not supported by admissible evidence and (2) her citation to ECF document number 37-2 was inaccurate.  DRPSAMF ¶ 27.  First, contrary to Dr. Hower's position, Dr. Lemire's deposition transcript is admissible evidence.  Next, a cursory glance at the docket reveals that Ms. Kimball intended to cite ECF document number 37-4 given her reference to the deposition's page numbers and the information on those pages supports paragraph 27.  *See* PRDSMF ¶ 27.  The Court overrules Dr. Hower's objections.

[16]    Ms. Kimball denied paragraph 28.  PRDSMF ¶ 28 (omitting a specific reason for her denial).  As the record citations Ms. Kimball highlights do not contradict Dr. Hower's statement in paragraph 28 and his statement is supported by the record, the Court does not accept Ms. Kimball's denial.  *See Dr. Lemire Dep.* at 14:12-16, 21:9-23.  Notably, this statement does not rule out the possibility that genital herpes can be caused by HSV-1.  *See* PRDSMF ¶ 28.

Dr. Hower objected to Ms. Kimball's denial for the same reasons as in his paragraph 27.  *See* DRPSAMF ¶ 28.  For the same reasons, the Court overrules Dr. Hower's objections.

harbors the virus for life, could have outbreaks at any time, and will forever be capable of transmitting the virus even while asymptomatic.[17]   DSMF ¶ 36; PRDSMF ¶ 36.

Symptoms associated with both genital and oral herpes are painful outbreaks of tiny blisters known as vesicles.  DSMF ¶ 29; PRDSMF ¶ 29.  Other symptoms, which usually precede vesicular outbreaks, are sensitivity, tingling, and/or pain in the area of the outbreak.  DSMF ¶ 29; PRDSMF ¶ 29.  Neither genital nor oral herpes causes non-blistering symptoms such as the common rash.  DSMF ¶ 30; PRDSMF ¶ 30.  With oral herpes, outbreaks appear on the lip similar to the common cold sore.  DSMF ¶ 31; PRDSMF ¶ 31.  With genital herpes, outbreaks appear on or near the genitals.  DSMF ¶ 32; PRDSMF ¶ 32.

When a person has had external symptoms of herpes, the disease is referred to by the "site" of the outbreak as either herpes genitalis (genital herpes) or herpes labialis (oral herpes); however, infection of HSV-1 or HSV-2 without symptoms is not considered a "disease."[18]  PSAMF ¶ 44; DRPSAMF ¶ 44.  HSV is treatable but

---

[17]     Ms. Kimball interposed a qualified response to paragraph 36 because herpes is a lifelong virus that renders carriers as "infected person[s]" within the meaning of the Maine public health statutes.  PRDSMF ¶ 36.  The Court includes Ms. Kimball's qualification insofar as it relates to the longevity of the virus but excludes the portion of her statement about "infected person[s]" under the Maine public health statutes because it is not supported by the record citation.  *See Dr. Lemire Dep.* at 43:7-44:22; *Sexually Transmitted Diseases,* CENTER FOR DISEASE CONTROL 1, 3 (Jan. 31, 2012) (ECF No. 37-10) (*CDC Fact Sheet).*

     Dr. Hower objected to Ms. Kimball's qualification because (1) she did not support admissible evidence to support her denial and (2) she improperly refers to ECF document number 37-2.  *See* DRPSAMF ¶ 36.  Again, Ms. Kimball must have intended to reference ECF document number 37-4, Dr. Lemire's deposition transcript, rather than document number 37-2.  Because Ms. Kimball's statement is supported by Dr. Lemire's testimony, the Court overrules Dr. Hower's objections.

[18]     Dr. Hower objected to the general admissibility of Ms. Kimball's statement as well as its inaccurate reference to document 37-2.  DRPSAMF ¶ 44.  Otherwise, Dr. Hower interposed a qualified response because "infection of HSV-1 or HSV-2 without symptoms is not considered a disease."  DRPSAMF ¶ 44.  First, the Court overrules Dr. Hower's objections as the Court located the

has no cure and there is no treatment for the infection alone.[19]   PSAMF ¶ 45; DRPSAMF ¶ 45.

### c.   Transmission and Prevention

HSV-1 infections are usually spread from non-sexual contact during childhood.   DSMF ¶ 34; PRDSMF ¶ 34.   It is generally accepted that most people are going to be infected with HSV-1 during their lifetime.   DSMF ¶ 35; PRDSMF ¶ 35.   In fact, the majority of people in the United States population—between sixty and ninety percent—is seropositive for HSV-1.   DSMF ¶ 33; PRDSMF ¶ 33.   Other than avoiding oral or genital contact with another person's active cold sore, there are no medical protocols for preventing the spread of HSV-1; however, though it may not equate precisely to a "medical protocol", doctors and medical professionals have long advised the "regular consistent use of condoms" as the third most effective means of reducing the risk of STD infection and transmission after (1) abstinence and (2) monogamy with a mutually faithful, uninfected person.[20]   DSMF ¶ 35;

---

appropriate support for Ms. Kimball's assertion in document 37-4.  *See Dr. Lemire Dep.* at 36:16-40:6.  But the Court includes Dr. Hower's qualification because it is supported by the record and excludes the part of paragraph 44, which states:  "and when the site of infection is not known because the person is asymptomatic, the infected person's disease is referred to by "type" of virus, i.e., Herpes Simplex Virus 1 (HSV-1) or Herpes Simplex Virus 2 (HSV-2)."  PSAMF ¶ 44; *see Dr. Lemire Dep.* at 55:3-56:10.

[19]   Dr. Hower objected to the general admissibility of Ms. Kimball's statement as well as its inaccurate reference to document 37-2 and also interposed a qualified response because "herpes outbreaks are treatable, but there is no treatment indicated for the presence of the infection alone." DRPSAMF ¶ 45.  The Court overrules Dr. Hower's objections but includes his qualified response because it is supported by the record.

[20]   Ms. Kimball interposed a qualified response to paragraph 35 because "though it may not equate precisely to a 'medical protocol' the 'regular and consistent use of condoms' has long been advised by doctors and medical professionals [ ] as the third most effective means of reducing the risk of STD infection and transmission [ ] and John reasonably should have been aware of such recommendations, but said he wasn't sure if he was."  PRDSMF ¶ 35.  The Court included Ms. Kimball's qualification because it is supported by the record citation; however, the portion of her statement regarding Dr. Hower's knowledge of the recommendations is argumentative and the Court

PRDSMF ¶ 35.  Dr. Hower said he was unsure whether he was aware of that recommendation.  PRDSMF ¶ 35.

Even though asymptomatic, a person infected with HSV-1 or HSV-2 can infect sex partners.[21]  PSAMF ¶ 41; DRPSAMF ¶ 41.  Approximately eighty-one percent of people infected with HSV, be it HSV-1 or HSV-2, are unaware of their infection because they have no related symptoms.  DSMF ¶ 37; PRDSMF ¶ 37.  This eighty-one percent statistic applies to reasonable and intelligent people who, if reasonably prudent, should use condoms regularly and consistently when engaging in sexual activity, especially when they have more than one sex partner or have had a number of sexual partners, to reduce the likelihood of getting and transmitting STDs.[22]  DSMF ¶ 38; PRDSMF ¶ 38.

One way to avoid transmission of STDs, including genital herpes, is to use condoms.[23]  PSAMF ¶ 39; DRPSAMF ¶ 39.  The correct and consistent use of latex

---

excludes "John reasonably should have been aware of such recommendations." *See CDC Fact Sheet;* PRDSMF ¶ 35.

[21]   Dr. Hower interposed the same objection for paragraph 41 as paragraph 40.  DRPSAMF ¶¶ 40-41.  For the same reasons the Court overrules his objections to paragraph 40 and because Ms. Kimball's statement is supported by the record citation, it overrules Dr. Hower's objections.  *See CDC Fact Sheet* at 3.

[22]   Ms. Kimball interposed a qualified response to paragraph 38 because the corollary of the statement is that reasonable and intelligent people should use condoms to prevent contracting and transmitting STDs.  PRDSMF ¶ 38.  The Court includes Ms. Kimball's qualification as it is supported by the record.  *See Dr. Lemire Dep.* 43:13-44:22; *CDC Fact Sheet* at 3.  Dr. Hower objected to Ms. Kimball's qualification for the same reasons he objected to her qualification in paragraph 36.  DRPSAMF ¶ 38.  The Court overrules his objections.

[23]   Ms. Kimball's paragraph 39 reads:

> The surest way to avoid transmission of sexually transmitted diseases, including genital herpes, is to abstain from sexual contact, and the next best way is to be in a long-term mutually monogamous relationship with a partner who has been tested and is known to be uninfected.  The third best way is to use condoms.

PSAMF ¶ 39.  Dr. Hower objected to paragraph 39 on the ground that it is not supported by the cited materials and document 37-2 does not contain the referenced pages or facts.  DRPSAMF ¶ 39.

condoms can reduce the risk of genital herpes by an estimated seventy percent.[24]

PSAMF ¶ 40; DRPSAMF ¶ 40.  A person infected with HSV-1 or HSV-2 can infect

sex partners even though asymptomatic.[25]   PSAMF ¶ 41; DRPSAMF ¶ 41.

Communicable disease and STD professionals urge their patients who have HSV-1

and STDs to advise their sex partners that they have the disease and to inform

their sex partners that they may become infected.[26]   PSAMF ¶ 42; DRPSAMF ¶ 42.

---

Although Dr. Hower is correct that Ms. Kimball miscited the docket number for Dr. Lemire's deposition, the Court concludes that her reference to ECF document number 37-2 was meant to refer to document number 37-4, Dr. Lemire's deposition testimony.  However, as the record citation only supports Ms. Kimball's statement about condoms, the Court omits the remaining portions of her paragraph concerning abstinence and monogamous relationships.  *See Dr. Lemire Dep.* at 43:1-44:25.

[24]      Dr. Hower objected to paragraph 40:

> This statement of fact should be stricken as Plaintiff has not cited to admissible evidence in support of her denial.

DRPSAMF ¶ 40.  He also objects because Ms. Kimball miscited the docket number for Dr. Lemire's deposition transcript.  *Id.*  The Court overrules Dr. Hower's objections.  Ms. Kimball's paragraph 40 is not a denial; it is an assertion of fact.  The Court has previously addressed Ms. Kimball's mistaken citation.  Finally, to support her assertion, Ms. Kimball cited a relevant portion of Dr. Lemire's testimony, which is admissible.  *See Dr. Lemire Dep.* at 41:3-20.

[25]      Dr. Hower objected to paragraph 41 due to Ms. Kimball's miscitation and on the ground that the statement is not supported by admissible evidence.  DRPSAMF ¶ 41.  The Court overrules Dr. Hower's objections.  The Court has previously addressed Ms. Kimball's miscitation.  The Court reviewed Exhibit 8 of Dr. Lemire's deposition, which is a Center for Disease Control Fact Sheet, and concludes that the exhibit, which was authenticated by Dr. Lemire, supports the contents of paragraph 41.

[26]      In paragraph 42, Ms. Kimball states:

> Sex partners of infected persons should be advised they may become infected by a person infected with a sexually transmitted or communicable disease.

PSAMF ¶ 42.

> In paragraph 47, she states:

> Communicable disease and STD professionals urge people infected with HSV and other STD's to inform their sex partners of that fact prior to sexual contact.

PSAMF ¶ 47.  Dr. Hower objected, noting that medical professionals agree that persons infected with HSV-2, who are aware of their infection, should inform their sexual partners, but asserting that the same is not true for those infected with HSV-1.  DRPSAMF ¶¶ 42, 47.  In fact, he stated that medical professionals do not advise their patients with HSV-1 to inform their sex partners of their infection.  DRPSAMF ¶ 47.

Generally, transmission of genital herpes or HSV-2 from an infected male to his female partner is more likely than from an infected female to her male partner. PSAMF ¶ 46; DRPSAMF ¶ 46.

### 6.   Dr. Hower's Statements Regarding HSV Testing and His Decision Not to Inform T.M. of Ms. Kimball's Results

In February 2011, Dr. Hower wrote to Ms. Kimball, "In the past I have not tested positive for HSV-2." PSAMF ¶ 49; DRPSAMF ¶ 49. Dr. Hower stated that he had previously been tested for syphilis and HSV-2 even though neither of these tests was an STD test that he thought he had been required to take by an employer.[27] PSAMF ¶ 50; DRPSAMF ¶ 50. That same month, Dr. Hower told Ms.

---

This paragraph opens up a complicated medical question, which at this stage the Court is required to view in the light most favorable to Ms. Kimball. The cited record evidence establishes that medical professionals tell their patients, who have tested positive for HSV-2, that they should inform their sexual partners that they are infected with HSV-2. *Dr. Lemire Dep.* at 43:13-44:4. The record evidence on HSV-1 is less clear. For HSV-1, the common cold sore, Dr. Lemire testified that ninety percent of the population is infected. *Dr. Lemire* 13:8-19. Furthermore, most people get HSV-1 from non-sexual contact, especially during childhood, *id.* 20:4-19, and Dr. Lemire testified that as regards HSV-1, she does not tell her patients to inform their sexual partners of their HSV-1 infection. *Id.* at 56:11-58:5. Based on this testimony, even viewing this evidence in the light most favorable to Ms. Kimball, the Court cannot conclude that Ms. Kimball's undifferentiated paragraphs are supported by the record evidence. The record evidence supports the proposition that those infected with HSV-2 should inform their partners and that those infected with HSV-1 need not. The Court sustains Dr. Hower's objection to paragraphs 42 and 47 and the Court has redrafted those paragraphs to limit their scope.

In paragraph 43, Ms. Kimball states, "A positive HSV-2 blood test most likely indicates that the person has genital herpes." PSAMF ¶ 43; DRPSAMF ¶ 43. Dr. Hower objected to this statement and denied it because "[t]here is no genital herpes until and unless there is an outbreak of symptoms." DRPSAMF ¶ 43. Dr. Hower's statement is supported by the record and Ms. Kimball's is not; the Court excludes Ms. Kimball's statement. *See Dr. Lemire Dep.* at 53:6-56:10.

[27]   Dr. Hower denied paragraph 50 because the "Defendant has never been tested for syphilis or HSV-2 . . . Defendant mistakenly thought he had been tested for syphilis as part of mandatory testing required by his employer . . . Defendant has never indicated he tested for HSV-2." DRPSAMF ¶ 50. The Court accepts Dr. Hower's denial insofar as it corrects the assertion that Dr. Hower was not required to get testing done by EMMC and that his mention of an HSV-2 test in an e-mail to Ms. Kimball was a mistake. The Court has altered Ms. Kimball's paragraph to establish that Dr. Hower thought this prior testing had been done, not that it in fact had been done. Otherwise, viewing the facts in the light most favorable to Ms. Kimball, her statement is supported by the record and the Court includes it. *See Hower Dep.* at 38:13-19; *Hower E-mail*; *Def.'s Am. Answers to Interrogatories*.

Kimball that he would voluntarily get tested for HSV-2 but never did.[28]   PSAMF ¶

54; DRPSAMF ¶ 54.

On February 21, 2012, Ms. Kimball asked Dr. Hower about informing T.M. of

her test results.[29]   PSAMF ¶ 57; DRPSAMF ¶ 57.   On April 18, 2012, Ms. Kimball

wrote T.M. and told T.M. about her test results because she understood that Dr.

Hower had not yet told T.M.[30]   PSAMF ¶ 58; DRPSAMF ¶ 58.   As of July 12, 2012,

Dr. Hower and T.M. were still not using condoms.[31]   PSAMF ¶ 59; DRPSAMF ¶ 59.

At first, Dr. Hower indicated that he had not asked T.M. about other medications

---

In paragraph 53 Ms. Kimball states, "[i]n January 2013 and March 2013, Dr. Hower stated that his employer had not required syphilis testing and that he had not taken any STD testing outside of employer required testing (i.e., HIV & Hepatitis), despite earlier statements to the contrary." PSAMF ¶ 53.  Dr. Hower denied this paragraph on the ground that Ms. Kimball did not cite the record.  DRPSAMF ¶ 53.  Dr. Hower correctly points out that according to Local Rule 56(f), "[t]he court may disregard any statement of fact not supported by a specific citation to record material . . . [and] shall have no independent duty to search or consider any part of the record not specifically referenced in the parties' separate statement of facts."  D. ME. LOC. R. 56(f).  The Court omits paragraph 53.

[28]   Dr. Hower denied paragraph 54 on the ground that the statement of fact is not supported by admissible evidence and is irrelevant.  DRPSAMF ¶ 54.  First, as Ms. Kimball's paragraph is supported by citations to a deposition transcript and an e-mail sent by Dr. Hower, the Court overrules Dr. Hower's admissibility objection.  See FED. R. EVID. 801(d)(2)(A) (confirming that an opposing party's statement that "was made by the party in an individual or representative capacity" is not hearsay if it is offered against the opposing party).  Further, the facts regarding Dr. Hower's actions and inactions as it relates to testing are relevant because they have  a "tendency to make a fact more or less probable than it would be without the evidence . . . [and] is of consequence in determining" her claim in Count I.  FED. R. EVID. 401.  The Court includes Ms. Kimball's statement over Dr. Hower's objections.

[29]   Dr. Hower objected to paragraph 57 on the ground that it is not supported by admissible evidence and is irrelevant.  DRPSAMF ¶ 57.  Here, again the Court overrules Dr. Hower's objections because the documents Ms. Kimball relies on to support her statement are admissible and relevant.  See FED. R. EVID. 401, 404(b) (stating that under Rule 404(b) some character evidence of past acts may be admissible to prove motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident).

[30]   Dr. Hower objected to paragraph 58 on the ground that it is not supported by admissible evidence and is irrelevant.  DRPSAMF ¶ 58.  Here, again the Court overrules Dr. Hower's objections because it concludes that the documents Ms. Kimball relies on to support her statement are admissible and relevant.  See FED. R. EVID. 401, 404(b).

[31]   Dr. Hower objected to paragraph 59 on the ground that it is not supported by admissible evidence and is irrelevant.  DRPSAMF ¶ 59.  Here, again the Court overrules Dr. Hower's objections because it concludes that the documents Ms. Kimball relies on to support her statement are admissible and relevant.  See FED. R. EVID. 401, 404(b).

she was taking when he renewed a prescription of hers, but he later said that he had complied with all requirements of Florida law in that regard. PSAMF ¶ 60; DRPSAMF ¶ 60.

In July 2012, Dr. Hower claimed that he had never been tested for HSV-2.[32] PSAMF ¶¶ 50-51; DRPSAMF ¶¶ 50-51. Also in July 2012, Dr. Hower stated that he had not taken STD tests other than those required by his employer. PSAMF ¶ 52; DRPSAMF ¶ 52. During that same month, he stated that he did not think it would bother him if he had gotten positive test results like Ms. Kimball's test results.[33] PSAMF ¶ 55; DRPSAMF ¶ 55. Later, in the fall of 2012, Dr. Hower objected to Ms. Kimball's request for a court order requiring him to undergo a blood test for HSV-1 and HSV-2.[34] PSAMF ¶ 56; DRPSAMF ¶ 56.

### 7.   The Parties' Sexual Histories and HPV

The greater the number of sex partners, the greater the odds of an STD.[35] PSAMF ¶ 61; DRPSAMF ¶ 61. By his own admission, Dr. Hower had been with at

---

[32]   In his response, Dr. Hower points out that Ms. Kimball's paragraph refers to "Jsv-2", not HSV-2, and admits the paragraph on that assumption. DRPSAMF ¶ 51. Reviewing Ms. Kimball's record citation, the Court concludes that "JSV-2" was intended to be "HSV-2." *See Hower Dep.* at 72:23-73:25; PSAMF ¶ 51.

[33]   Dr. Hower objected to paragraph 55 on the ground that it is not supported by admissible evidence and is irrelevant. DRPSAMF ¶ 55. The Court overrules Dr. Hower's objections because citations to a deposition transcript are proper and because the facts in paragraph 55 are relevant to Ms. Kimball's claim in Count I. *See* FED. R. EVID. 401.

[34]   Dr. Hower objected to paragraph 56 on the ground that it is not supported by admissible evidence and is irrelevant. DRPSAMF ¶ 56. Dr. Hower's relevancy objection is based on the argument that what happened after suit was filed is not relevant to the negligence analysis. *Id.*

The Court agrees with Dr. Hower that this evidence is of questionable admissibility. Once suit was filed, whether to undergo the blood test was legally-based and evidence of tactical decisions might well not survive a Rule 403 analysis. Yet, the Court included the paragraph here solely for credibility purposes. According to paragraph 54, Dr. Hower told Ms. Kimball that he would voluntarily undergo a blood test and he later refused to do so, and the contradiction could affect his credibility. PSAMF ¶ 54.

[35]   Dr. Hower objected to paragraph 61 on the ground that it is not supported by admissible evidence and inaccurately cites document 37-2. DRPSAMF ¶ 61. Alternatively, Dr. Hower denied

least six other sex partners besides Ms. Kimball, including at least one one-night stand, and one of his sex partners had several affairs.[36]  PSAMF ¶ 62; DRPSAMF ¶ 62.  Ms. Kimball had known her husband since childhood, as he lived around the corner from her and they attended the same church, schools, and some classes. PSAMF ¶ 63; DRPSAMF ¶ 63.  Her husband had never been known have sexual relations with anyone but her.[37]  PSAMF ¶ 63; DRPSAMF ¶ 63.

In the early years of their relationship, Dr. Hower told Ms. Kimball that she could "thank" him for giving her the Human Papilloma Virus (HPV).  PSAMF ¶ 64; DRPSAMF ¶ 64.  She tested positive for HPV in 2002.  PSAMF ¶ 64; DRPSAMF ¶ 64.  In years past, Dr. Hower operated on a couple of patients without learning until later about their being HIV-positive and throughout the last few decades, Dr. Hower has been required to undergo training and take routine precautions on this job (and always has done so) to reduce the risk of infection of HIV to himself and

---

paragraph 61 on the ground that exhibit 8 of document 37-4 does not support Ms. Kimball's assertion.  DRPSAMF ¶ 61.  The Court overrules Dr. Hower's objections because it determines that Ms. Kimball intended to cite to exhibit 8 of Dr. Lemire's deposition testimony.  *See CDC Fact Sheet.* Viewing the facts in the light most favorable to Ms. Kimball, the Court concludes that her statement is supported by the CDC's Fact Sheet as it states, "[t]he surest way to avoid transmission of sexually transmitted diseases, including genital herpes, is to abstain from sexual contact, or to be in a long-term mutually monogamous relationship with a partner who has been tested and is known to be uninfected."  *Id.* at 4.

[36]   Dr. Hower objected to part of paragraph 62 on the ground that  "[t]he portion of this assertion indicating 'most of his partners had had one or more other spouses or sex partners' should be stricken as Plaintiff has not cited to evidence in support of that assertion."  DRPSAMF ¶ 62. Upon reviewing the record citation, the Court sustains Dr. Hower's objection because this part of Ms. Kimball's statement is not supported by the record.

[37]   Plaintiff's paragraph 63 actually states that her late husband was never known to "be sexual" with anyone but her.  PSAMF ¶ 63.  The phrase "be sexual" is so odd and ambiguous that the Court inserted "have sexual relations".

others through his frequent contact with patients' blood and bodily fluids.[38]  PSAMF
¶ 65; DRPSAMF ¶ 65.

### 8.    Ms. Kimball's Reaction to Dr. Hower's Affair and Her Positive HSV Test Results

As a result of discovering Dr. Hower's affair in 2010, Ms. Kimball experienced
severe stress, stress-related physical pain, diarrhea, an upset stomach, and she lost
some time from work.  PSAMF ¶ 67; DRPSAMF ¶ 67.  In March 2011, after getting
her STD test results and realizing that Dr. Hower had never ended the affair with
T.M., Ms. Kimball was deeply anguished and despaired "beyond what [John had]
ever come to recognize in anyone in [his] life."  PSAMF ¶ 69; DRPSAMF ¶ 69.  In
2011, Ms. Kimball began experiencing extreme distress in the form of unremitting
and sustained feelings of shock, hurt, difficulty sleeping, eating and daily
functioning, as well as nightmares, flashbacks and prolonged spells of crying and
despondence.[39]  PSAMF ¶ 70; DRPSAMF ¶ 70.

---

[38]    Dr. Hower objected to paragraph 65 because it referred to document 17-3, which does not
support the statement.  DRPSAMF ¶ 65.  Without waiving his objection, in the event the Court
concludes that Ms. Kimball intended to refer to document 17-5, Dr. Hower objected to part of the
statement beginning after the first comma on the ground that it is not supported by the record.
DRPSAMF ¶ 65.  The Court concludes that Ms. Kimball intended to cite document 17-5 and
overrules Dr. Hower's objection regarding the exclusion of part of paragraph 65 because, viewing the
facts in the light most favorable to Ms. Kimball, his deposition testimony supports all of the facts in
paragraph 65.  *See Hower Dep.* at 76:19-77:25 ("we had - - the basic things that surgeons were doing,
washing their hands, wearing gloves during operations . . . the standard techniques were fine").
[39]    Dr. Hower objected to paragraph 70 on the ground that the cited report by Roger Phelps,
Psy.D, constitutes hearsay given that it is not a medical record kept in a doctor's ordinary practice.
DRPSAMF ¶ 70.  Dr. Hower is technically correct.  But this is the type of objection that the Local
Rule 56(h) conference was intended to avoid.  Dr. Hower makes no assertion that Dr. Phelps would
not state in admissible form the contents of his report.  Therefore, Ms. Kimball could readily cure the
evidentiary defect by filing an affidavit from Dr. Phelps containing the same information.
Accordingly, the Court will consider the contents of paragraph 70.  If Dr. Hower maintains the
objection, he is free to alert the Court and the Court will conditionally strike the sentence and allow
Ms. Kimball to obtain an appropriate affidavit.

## II.     THE PARTIES' POSITIONS

### A.     Dr. Hower's Motion

First, with respect to Count I, Dr. Hower argues that "the undisputed facts establish that [Ms. Kimball] has not suffered any STD or resulting physical harm" because she has never had any symptoms of oral or genital herpes.  *Def.'s Mot.* at 5-6.  He points out that Ms. Kimball's own expert unequivocally stated that without evidence of herpetic outbreaks, she does not have genital herpes.  *Id.* at 6.  Citing *McPherson v. McPherson*, 1998 ME 141, 712 A.2d 1043, Dr. Hower asserts that he did not owe a duty to Ms. Kimball, his ex-girlfriend, because similar to the husband in *McPherson* he did not have any physical symptoms of HSV-1 or HSV-2, did not have knowledge that any previous sexual partners had the STDs, and was not diagnosed with HSV-1 or HSV-2 before the consensual sexual relationship with Ms. Kimball.  *Id.* at 7-8.

Next, Dr. Hower notes that it would be improper to hold him to a higher standard of care simply because he is a doctor as this is not a medical malpractice case; rather, it is a lawsuit concerning his personal relationship with Ms. Kimball. *Id.* at 9-10.   Accordingly, he claims that the standard of care applicable to him should be that of an "ordinary, careful person." *Id.* at 9.  He also argues that (1) Ms. Kimball cannot prove that he transmitted HSV-1 to her because he tested negative for it and (2) she cannot prove that he gave her HSV-2 because there is no evidence that her late husband was tested for HSV-2. *Id.* at 11-12.

Finally, Dr. Hower contends that Ms. Kimball cannot prevail on Count II based on her Post Traumatic Stress Disorder (PTSD) as this is not a bystander

18

liability action and the parties did not have a "special relationship." *Id.* at 12-13. Because the Maine Law Court narrowly construes the meaning of a "special relationship" in negligent infliction of emotional distress cases and has not found that a romantic or sexual relationship qualifies for that status, Dr. Hower claims he did not breach a duty to Ms. Kimball. *Id.* at 13-14.

### B.    Ms. Kimball's Opposition

Ms. Kimball highlights several issues of genuine material fact, which she argues require denial of Dr. Hower's motion. *Pl.'s Opp'n* at 1-16. First, regarding Count I, she asserts that she was "physically and unalterably harmed" by Dr. Hower because after having a romantic relationship with him she tested positive for HSV-1 and HSV-2. *Id.* at 1-2. As a result of her positive test results, she states her life has completely changed because: (1) her blood contains HSV-1 and HSV-2 antibodies, (2) there is no cure for the viruses, (3) the viruses may become active and cause painful sores at any time during her life, and (4) she will always be capable of transmitting the disease to future sexual partners. *Id.* Ms. Kimball also rejects Dr. Hower's points about the limitations of the opinions of her expert witness, Dr. Ann Lemire, because although Ms. Kimball will not technically have genital herpes unless and until she has an outbreak, she has "'circulating antibodies of Herpes 1 and 2.'" *Id.* at 2. Comparing *McPherson* to the facts here, Ms. Kimball argues that proof of an STD infection, rather than symptoms, is sufficient to make a claim of negligent transmission of an STD under Maine law. *Id.* at 4-5, 14-15 (citing *McPherson*, 1998 ME 141, 712 A.2d 1043).

19

Next, Ms. Kimball argues that Dr. Hower's conduct and admissions establish that he owed her a duty and that he knew or should have known that his conduct—unprotected sex and an affair—put her at risk of being infected with STDs, including HSV-1 and HSV-2. *Id.* at 6. Ms. Kimball points to Dr. Hower's statements, namely that: (1) he had fever blisters as a child, (2) he had been tested for HSV-2 for work along with other STDs, (3) that Ms. Kimball got tested simply to "prove [him] dirty", and (4) that she could thank him for the "gift" of HPV. *Id.* at 6-9. Because Dr. Hower subsequently contradicted these statements and denied being tested for HSV-2, Ms. Kimball questions Dr. Hower's credibility and claims that his inconsistencies generate genuine issues of material fact. *Id.* at 7.

Ms. Kimball also contends that because Dr. Hower continued to have unprotected sex after learning of her HSV infection and failed to voluntarily get tested for HSV, he likely "already knew . . . of her test results [and] that [he] had been exposed to or was carrying HSV-2." *Id.* at 9-10. Further, she asserts that given his profession, education, and experience, Dr. Hower should have known that he could transmit STDs to her based on his history of sex partners and unprotected sex. *Id.* These facts, she claims, establish that Dr. Hower was more likely than not the proximate cause of her HSV-1 and HSV-2 diagnosis. *Id.* at 11-12. She argues that this is especially true where Ms. Kimball "had only one other partner before [Dr. Hower], her husband of 22 years who died two years before she met [Dr. Hower]." *Id.* at 13.

Finally, given her discovery of Dr. Hower's affair and positive HSV test results, Ms. Kimball argues that she has a valid claim in Count II for NIED. *Id.* at 16.

### C.    Dr. Hower's Reply

Regarding Ms. Kimball's HSV-1 diagnosis, Dr. Hower points out that he tested negative for HSV-1 and that "most cases of HSV-1 are passed through non-sexual contact during childhood." *Def.'s Reply* at 1.   Further, he argues that the fever blisters, which initially caused him to believe that he had HSV-1, likely were caused by something other than HSV-1 given his negative tests. *Id.* at 2.   Finally, Dr. Hower asserts that "[b]ased on [Ms. Kimball's] positive HSV-1 test and [his] negative HSV-1 test, if [her] argument is accepted, [Ms. Kimball] negligently put [him] at risk by potentially exposing him to the HSV-1 virus she has carried." *Id.* at 1 n.1.

Next, Dr. Hower argues that the Court should grant summary judgment on Count I as it relates to her HSV-2 diagnosis.   Dr. Hower contends that he never breached a duty he owed to Ms. Kimball because: (1) he has never had symptoms of genital herpes; (2) he never saw symptoms of genital herpes on his past sexual partners; and (3) he was never tested for HSV-2 prior to his court-ordered HSV test on October 16, 2012. *Id.* at 2-3.   Also, he urges the Court to disregard evidence related to Ms. Kimball's HPV infection and his mistaken belief that he was tested for syphilis because those facts are not material to the current lawsuit. *Id.* at 3-5. Similarly, he contends that his training on avoiding the transmission of HIV and STDs during operations is irrelevant because it does not establish that he had

specialized training or knowledge concerning how to avoid the transmission of HSV-2. *Id.* at 4.

Dr. Hower also disputes the relevance of Ms. Kimball's reference to his conduct after she told him about her positive test results because that conduct "has no bearing on whether [he] knew or should have known that he was infected with an STD before he had sexual relations with [her]." *Id.* at 5-6. Finally, he contends that Ms. Kimball's argument regarding unprotected sex is unpersuasive because even under *McPherson*, there is no evidence that a person who has unprotected sex with multiple people "should know he is infected with HSV-2." *Id.* at 6-7. Even if he had a duty to wear condoms, it "would not be entirely effective against transmission of HSV-2, as it is only 70% effective." *Id.* at 7.

## III.   DISCUSSION[40]

### A.   Summary Judgment Standard

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). A fact is "material" if it "has the potential to change the outcome of the suit." *Tropigas de Puerto Rico, Inc. v. Certain Underwriters at Lloyd's of London*, 637 F.3d 53, 56 (1st Cir. 2011) (quoting *McCarthy v. Nw. Airlines, Inc.*, 56 F.3d 313, 315 (1st Cir. 1995)). An issue is "genuine" if "a reasonable jury could resolve the point in favor of the nonmoving party." *Id.* (quoting *McCarthy*, 56 F.3d at 315).

---

[40]   The parties agree that Maine law applies to Ms. Kimball's claims. *Def.'s Mot.* at 5-14; *Pl.'s Opp'n* at 1-16 (analyzing Ms. Kimball's tort claims under Maine law).

"The party moving for summary judgment must demonstrate an absence of evidence to support the nonmoving party's case." *Phair v. New Page Corp.*, 708 F. Supp. 2d 57, 61 (D. Me. 2010) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986)).  "In determining whether this burden is met, the Court must view the record in the light most favorable to the nonmoving party and give that party the benefit of all reasonable inferences in its favor." *Id.* (citing *Santoni v. Potter*, 369 F.3d 594, 598 (1st Cir. 2004)).  However, the Court "afford[s] no evidentiary weight to 'conclusory allegations, empty rhetoric, unsupported speculation, or evidence which, in the aggregate, is less than significantly probative.'" *Tropigas*, 637 F.3d at 56 (quoting *Rogan v. City of Boston*, 267 F.3d 24, 27 (1st Cir. 2001)).

## B.    Count I:  Negligent Infliction of Physical Harm

### 1.    *McPherson v. McPherson*

In *McPherson*, the Maine Supreme Judicial Court recognized "a novel theory of negligence" and allowed the plaintiff to pursue a negligence action based on the transmission of an STD.  1998 ME 141, ¶ 6, 712 A.2d at 1045.  Citing caselaw regarding negligence claims for the transmission of communicable diseases, the Law Court stated that it could "conceive of no principled reason to distinguish the consequence suffered here by [the plaintiff], infection with a disease, from any other physical harm that could befall a person because of the negligence of another . . . ." *Id.* ¶ 7, 712 A.2d at 1045.  The plaintiff in *McPherson* sued her ex-husband because he infected her with a STD—HPV—which he acquired through an extramarital affair. *Id.* ¶¶ 1-2, 712 A.2d at 1044.

23

At the close of the bench trial in *McPherson*, the trial court concluded that the plaintiff was infected with HPV, that she likely contracted the virus through sexual contact, that her ex-husband was her only sexual partner, that her ex-husband had an extramarital affair, that he more likely than not infected her with HPV, and that he did not take any steps to protect her from possible infection with an STD. *Id.* ¶ 3, 712 A.2d at 1044. Despite the trial court's factual findings, the plaintiff did not prevail on her negligence claim because the trial court concluded that there was no legally-enforceable "duty to be sexually faithful in marriage." *Id.* ¶ 4, 712 A.2d at 1044-45. On appeal, the Law Court held that "one who knows or should know that he or she is infected with a sexually transmitted disease is under a duty to protect sexual partners from infection." *Id.* ¶ 11, 712 A.2d at 1046. Nevertheless, in *McPherson*, the Law Court affirmed the judgment. *Id.* ¶ 14, 712 A.2d at 1046. The Law Court concluded that the defendant did not breach his duty because he "did not know or have reason to know" that he had HPV when he infected the plaintiff. *Id.* ¶¶ 9, 11, 712 A.2d at 1045-46. Accordingly, the *McPherson* Court concluded that because the defendant had not breached any duty to his ex-wife, he could not be "held liable to her in negligence." *Id.* ¶ 11, 712 A.2d at 1046.

### 2.   *McPherson* Applied

To analyze the plaintiff's STD negligence claim, the Law Court in *McPherson* applied the standard negligence test, which requires the plaintiff to prove "[1] that the defendant owed a duty to the plaintiff, [2] that the defendant breached that

duty, and [3] that the plaintiff suffered an injury as a result of that breach." *Id.* ¶ 8; 712 A.2d at 1045; *see McIlroy v. Gibson's Apple Orchard*, 2012 ME 59, ¶ 8, 43 A.3d 948, 951 (stating that "[a] negligence action has four elements: a duty owed, a breach of that duty, an injury, and a finding that the breach of duty was a proximate cause of the injury"). Following the Law Court's guidance, the Court addresses each element.

### a.   Duty

At trial in *McPherson*, the judge had found that Mr. McPherson neither knew nor should have known that he had HPV. 1998 ME 141, ¶ 3, 712 A.2d at 1044. The trial court found that the defendant (1) had no physical symptoms of HPV, (2) had no knowledge of any other sexual partner with HPV symptoms, and (3) had no medical diagnosis of any kind of a sexually transmitted disease. In affirming the trial judge, the Law Court concluded that because Mr. McPherson did not know or have reason to know that he had HPV, he had "not breached any legal duty" to his wife and could "not be held liable to her in negligence." *Id.* ¶ 11, 712 A.2d at 1046.

### i.   HSV-1

Applying *McPherson*, there is no genuine issue of material fact with respect to Ms. Kimball's HSV-1 diagnosis. Following the October 16, 2012 blood sample, Dr. Hower tested negative for HSV-1. DSMF ¶ 22; PRDSMF ¶ 22. The HSV-1 virus can be treated, not cured. DSMF ¶ 36; PRDSMF ¶ 36; PSAMF ¶¶ 44-45; DRPSAMF ¶¶ 44-45.

The only evidence that Dr. Hower ever had or still has HSV-1 is contained in an email dated February 21, 2011, in which Dr. Hower informed Ms. Kimball that he knew he was positive for HSV-I.  DSMF ¶ 23; PRDSMF ¶ 23.  But Dr. Hower wrote his February 21, 2011 e-mail before he underwent the October 16, 2012 court-ordered blood test, which revealed that he did not have HSV-1.  DSMF ¶ 22; PRDSMF ¶ 22.  Given the permanent nature of an HSV-1 infection and Dr. Hower's negative test results, Dr. Hower did not have a duty to protect Ms. Kimball from transmitting a virus he did not have.

### ii.    HSV-2

By contrast, Dr. Hower tested positive for the HSV-2 virus.  DSMF ¶ 22; PRDSMF ¶ 22.  The record contains no evidence that he actually knew he had the HSV-2 virus before receiving the results of the October 16, 2012 testing.  Thus, the question turns to whether Ms. Kimball has generated a genuine issue of material fact as to whether he should have known he was infected.

The Court addresses first the evidence that impressed both the trial judge and the Law Court in *McPherson*.  Like *McPherson*, there is no evidence that Dr. Hower had any physical symptoms consistent with HSV-2 or that any of his sex partners were infected.  Unlike *McPherson*, there is evidence that Dr. Hower previously had a sexually transmitted disease, namely HPV.  Sometime in 2002, he informed Ms. Kimball that he had infected her with HPV, and she subsequently tested positive.  PSAMF ¶ 64; DRPSAMF ¶ 64.  Despite his revelation and her confirmation, Dr. Hower and Ms. Kimball continued to have unprotected sexual

relations after 2002.  DSMF ¶¶ 1, 9; PRDSMF ¶¶ 1, 9; PSAMF ¶ 41; DRPSAMF ¶ 41.

The presumed significance of a prior STD diagnosis is two-fold: (1) the activity that caused one sexually transmitted disease might have caused another; and (2) once infected with one STD, a person should be more aware of need to avoid the risk.  As Dr. Hower contracted one STD, namely HPV, the inference could be drawn that he had a duty to avoid transmitting STDs to others and to learn whether he had contracted other STDs.  Apart from this common sense inference, there is virtually no record evidence.  There is no evidence as to whether people who contract HPV commonly have other STDs, including HVS-2.  There is no specific evidence about how Dr. Hower contracted HPV and precisely when he contracted it.  There is also no evidence as to how HPV—as opposed to other STDs—is contracted.  The record does not clarify whether HPV is more like HVS-2 and usually contracted by sexual contact or whether it is more like HVS-1 and usually contracted by non-sexual contact.  The record does not address whether Dr. Hower, who is a vascular surgeon, was at risk for contracting HPV from exposure to blood and other fluids during surgery.  This single piece of evidence—that Dr. Hower had HPV—is a thin reed to deflect summary judgment.

A second piece of evidence is Dr. Hower's multiple sex partners.  According to the record, Dr. Hower had at least six sex partners, including one one-night stand, besides Ms. Kimball.  PSAMF ¶ 62; DRPSAMF ¶ 62.  Again, it is common sense that the more sex partners, the greater the risk of acquiring a STD.  PSAMF ¶ 61;

DRPSAMF ¶ 61.  Depending on the circumstances, just one other sex partner may not be enough.  In *McPherson*, the Law Court affirmed a trial court finding that a husband who had one extra-marital affair did not know and did not have reason to know that he had a STD.  1998 ME 141, ¶ 11, 712 A.2d at 1046.  However, the *McPherson* Court was addressing the legal sufficiency of a factual finding by a trial court and here the question is whether, viewed in the light most favorable to Ms. Kimball, there is a genuine issue of material fact as to whether, in view of his sexual history, Dr. Hower should have known that he was infected with HVS-2.

Again, the record evidence is undeveloped.  The record only states that Dr. Hower had six other sex partners.  Other than his relationship with T.M., the record does not reveal when these relationships took place, whether he used a condom with women other than T.M., and whether the women were themselves at heightened risk for carrying a STD.  Nevertheless, the Court is required to view the evidence in the light most favorable to Ms. Kimball and, even though this evidence alone is hardly overwhelming, it generates a jury question as to his duty.

A third point of evidence is Dr. Hower's failure to use a condom in his relationship with Ms. Kimball and with T.M.  DSMF ¶ 9; PRDSMF ¶ 9; PSAMF ¶ 59; DRPSAMF ¶ 59.  Dr. Hower's failure to use condoms with Ms. Kimball, Ms. Kimball's limited sexual history, Dr. Hower's positive HSV-2 test, and her positive HSV-2 test raise an inference that he was the source of her HSV-2 infection.  However, again, there is a paucity of evidence about Dr. Hower's condom use with other women and whether he was or should have been aware that his sexual history

generated a greater risk to Ms. Kimball. If he did not use a condom in any of his other sexual encounters, he would have been at greater risk of contracting an STD and would have had a greater obligation to determine whether he in fact had one.

A fourth point of evidence is Dr. Hower's February 21, 2011 e-mail to Ms. Kimball in which he admitted that he was HSV-1 positive. Starting with this e-mail, Ms. Kimball argues that the following facts would allow a reasonable juror to infer that Dr. Hower knew or should have known he had HSV-2 and owed her a duty because: (1) in an e-mail dated February 21, 2011, which Dr. Hower sent to Ms. Kimball after she informed him of her positive HSV test results, he stated, "[i]n the past I have not tested positive for HSV-2" but had tested positive for HSV-1; (2) in July 2012, Dr. Hower retracted that statement and claimed he was never tested for HSV-2; and (3) in October 2012, he tested positive for HSV-2 and negative for HSV-1. DSMF ¶¶ 22-23; PRDSMF ¶¶ 22-23; PSAMF ¶¶ 49, 51; DRPSAMF ¶¶ 49, 51; *Pl.'s Opp'n* at 6-7. Ms. Kimball asserts that the confusion over Dr. Hower's statements about his test results when viewed together with the actual results of his HSV testing and his reluctance to get tested for HSV, raises a factual issue for the jury regarding whether he actually knew that he had HSV-2. *See* PSAMF ¶ 56; DRPSAMF ¶ 56; *Pl.'s Opp'n* at 6-7, 9-11.

Again, the evidence is hardly compelling. In view of the October 2012 test results, Dr. Hower was demonstrably mistaken in his February 21, 2011 e-mail about the positive HSV-1 test. Ms. Kimball's contention is that based on his February 2011 e-mail, he must have undergone a prior STD test, which was positive

for HSV-2, and that he in fact knew all along he was HSV-2 positive.  In light of his retraction and viewing the evidence in the light most favorable to Ms. Kimball, the Court cannot exclude the possibility that a jury could find Dr. Hower's first e-mail was a mistaken reference to a positive HSV-2 test, and this standard is sufficient to escape summary judgment.

The Court is more dubious about Ms. Kimball's claim that Dr. Hower's refusal to voluntarily take a STD test after she tested positive is probative of his negligence.  Ms. Kimball discovered she was positive for HSV-1 and HSV-2 shortly after her February 14, 2011 doctor's visit.  DSMF ¶¶ 12-13; PRDSMF ¶¶ 12-13.  On February 21, 2011, Dr. Hower e-mailed Ms. Kimball, stating in part that "[w]hen I get my next blood work next month, I will have titers drawn."  PSAMF ¶ 49 (citing ECF No. 17-5, Ex. 11).  Shortly after his e-mail, Ms. Kimball e-mailed a reply:[41]

> I don't care about your results.  Your total lack of humanity is just overwhelming!!  Have all the lab work you want, as you said, you can't help me.  I am just a piece of garbage left outside to finish rotting.  You knew you had HSV1 and never told me that either.  Your conscience just doesn't function does it? How do you live with yourself?

*Id.*  In light of Ms. Kimball's reply, Dr. Hower's later decision not to voluntarily undertake a blood test is hardly indicative of his supposed knowledge.  Ms. Kimball herself conceded that his results would not help her medical situation.  By that time, the only reason for the blood work would be to advance Ms. Kimball's legal

---

[41]    Ms. Kimball's e-mail is not reflected in the statements of material fact, but Dr. Hower's response to her e-mail is referenced.  PSAMF ¶ 49; DRPSAMF ¶ 49.  The Court has not considered her e-mail in deciding the merits of the motion.  Having reviewed the e-mail, the Court references it to illustrate its concern about this part of Ms. Kimball's argument.

case against him and Dr. Hower's later decision to decline to prove her case against him is understandable.

In sum, although the record evidence does not overwhelming support a finding that Dr. Hower owed Ms. Kimball a duty under *McPherson*, the Court concludes there are genuine issues of material fact regarding whether Dr. Hower knew or should have known he had an HSV-2 infection when he had unprotected sex with Ms. Kimball.[42]

### b.    Breach

Ms. Kimball argues that when Dr. Hower had unprotected sex with her, he breached his duty of care to protect her from contracting HSV-2.  *Pl.'s Opp'n* at 9-16. The record confirms that Dr. Hower never wore condoms when he had sex with Ms. Kimball and did not wear condoms with T.M. even after learning of Ms. Kimball's HSV-2 infection.  DSMF ¶ 9 PRDSMF ¶ 9; PSAMF ¶ 59; DRPSAMF ¶ 59.  Condoms are generally accepted as a means to reduce the transmission of STDs, including HSV-2.  PSAMF ¶¶ 39-40; DRPSAMF ¶¶ 39-40.  Because a person who is infected with HSV-2 can infect sex partners even though asymptomatic, if Dr. Hower had a duty to protect Ms. Kimball from infection, a reasonable juror could find that he

---

[42]    Ms. Kimball also bases her duty argument on other facts including: (1) Dr. Hower's reluctance to inform T.M. of Ms. Kimball's positive HSV test results, (2) his decision to continue unprotected sex with T.M. after learning of Ms. Kimball's diagnosis, and (3) his statement that it would not bother him to receive Ms. Kimball's diagnosis.   PSAMF ¶¶ 55, 57-59; DRPSAMF ¶¶ 55, 57-59; *Pl.'s Opp'n* at 9-13.  She argues that these facts require the Court to deny Dr. Hower's motion. *Pl.'s Opp'n* at 9-13.  Dr. Hower argues that these facts are irrelevant to the question of whether he owed Ms. Kimball a duty because they all occurred after the parties ended their relationship and after the time period of alleged HSV transmission.  *Def.'s Reply* at 1-7.  The Court recognizes that the relevance of the evidence supporting these facts would likely be challenged at trial pursuant to Rule 401.  FED. R. EVID. 401.  As the resolution of these evidentiary issues is unnecessary to resolve the pending motion, the Court defers ruling.

should have used condoms.  PSAMF ¶¶ 39-41; DRPSAMF ¶¶ 39-41 (noting that the use of condoms can reduce the risk of contracting genital herpes by seventy percent); *see McPherson*, 1998 ME 141, ¶ 11, 712 A.2d at 1044 ("a person who knows that he has an STD 'is under a duty to either abstain from sexual contact with others or, at least, to warn others of the infection prior to having contact with them'") (quoting *Berner*, 543 So. 2d at 689).  This is also true given that transmission of HSV-2 is more likely to occur from an infected male to his female partner.  PSAMF ¶ 46; DRPSAMF ¶ 46.  Whether, in fact, he breached a duty he owed to Ms. Kimball is for the jury.

### c.    Injury

Both Ms. Kimball and Dr. Hower tested positive for HSV-2; however, only Ms. Kimball tested positive for HSV-1.  DSMF ¶¶ 13, 22; PRDSMF ¶¶ 13, 22.  Because Ms. Kimball is asymptomatic for HSV-1 and HSV-2, Dr. Hower argues that Ms. Kimball has failed to establish an injury or physical harm.  DSMF ¶¶ 17-18; PRDSMF ¶¶ 17-18; *Def.'s Mot.* at 5-6.  Contrary to Dr. Hower's argument, in *McPherson*, the Maine Supreme Judicial Court referred to the plaintiff's injury as a STD infection, not STD symptoms.  1998 ME 141, ¶¶ 2-3, 11, 712 A.2d at 1044-46 (emphasizing "infection" when describing the plaintiff's injury and the defendant's duty to "protect sexual partners from infection").

Although Dr. Lemire testified that Ms. Kimball will not technically have oral or genital herpes until she has symptoms of HSV-1 or HSV-2, such as tiny painful blisters, Dr. Lemire also stated that a person who tests positive for HSV-1 or HSV-2

has still been infected with the HSV virus, harbors the virus for life, could have outbreaks at any time in the future, and will forever be capable of transmitting the virus even while asymptomatic.  DSMF ¶¶ 20-21, 29, 36; PRDSMF ¶¶ 20-21, 29, 36.  Given Ms. Kimball's positive HSV test results and the fact that the viruses are only transmitted when an uninfected person engages in some sort of physical contact with an infected person, the Court concludes that Ms. Kimball has raised a genuine issue of material fact as to whether she has suffered actionable physical harm.  *See McPherson*, 1998 ME 141, 712 A.2d 1043; DSMF ¶¶ 27-28, 34; PRDSMF ¶¶ 27-28, 34 (confirming that HSV-1 and HSV-2 are transmitted through sexual and non-sexual physical contact with infected persons).[43]

### d.    Causation

The Law Court defines causation as "some reasonable connection between the act or omission of the defendant and the damage which the plaintiff has suffered.'" *McIlroy*, 2012 ME 59, ¶ 8, 43 A.3d at 951 (quoting *Walter v. Wal-Mart Stores, Inc.*, 2000 ME 63, ¶ 17, 748 A.2d 961, 968).  In *Crowe v. Shaw* 2000 ME 136, 755 A.2d 509, , the Law Court stated "[e]vidence is sufficient to support a finding of proximate cause if [1] the evidence and inferences that may reasonably be drawn from the evidence indicate that the negligence played a substantial part in bringing about or actually causing the injury or damage and [2] that the injury or damage

---

[43]    Ms. Kimball cites *Bragdon v. Abbott*, 524 U.S. 624 (1998) for support of the proposition that an infection without symptoms is sufficient to constitute an impairment. *Pl.'s Resp.* at 5.  Although there are significant differences between *Bragdon* and this case, the Supreme Court's conclusion that an asymptomatic infection may constitute an impairment under the Americans with Disabilities Act is consistent with this Court's conclusion in this case that an asymptomatic infection may constitute an injury under Maine tort law.

was either a direct result or a reasonably foreseeable consequence of negligence." *Id.* 2000 ME 136, ¶ 10, 755 A.2d at 512.

Generally, causation is a question for the fact-finder. *McIlroy*, 2012 ME 59, ¶ 8, 43 A.3d at 951 (stating that judgment as a matter of law and summary judgment should be denied if "'any reasonable view of the evidence could sustain a finding of proximate cause'") (quoting *Dryer v. Me. Drilling & Blasting, Inc.*, 2009 ME 126, ¶ 32, 984 A.2d 210, 219). However, "[t]he mere possibility of such causation is not enough, and when the matter remains one of pure speculation or conjecture, or even if the probabilities are evenly balanced, a defendant is entitled to [summary] judgment." *Shaw,* 2000 ME 136, ¶ 10, 755 A.2d at 512. Applying that standard, the *Shaw* Court granted summary judgment for the defendant because the plaintiff lost control of her car, collided with the defendant's car, and failed to present any evidence connecting his drunk driving to her injury. *Id.* ¶ 11, 755 A.2d at 512.

Here, Dr. Hower argues that there is insufficient evidence to establish that he is the proximate cause of Ms. Kimball's HSV-2 diagnosis because (1) he never tested positive for HSV-2 until after she informed him of her positive test results and (2) it is unknown whether her late husband had HSV-2. *Def.'s Mot.* at 11-14. Nonetheless, unlike in *Shaw*, Ms. Kimball has highlighted some facts which would allow a reasonable juror to connect Dr. Hower to her HSV-2 infection. First, the facts in the record and reasonable inferences drawn from those facts suggest that Dr. Hower's negligence may have caused Ms. Kimball's injury. *See Shaw*, 2000 ME 136, ¶ 10, 755 A.2d at 512. Although Ms. Kimball was not tested for HSV-2 before

February 14, 2011, Ms. Kimball only had one sexual partner, her deceased husband, before she began a romantic relationship with Dr. Hower.  *See* DSMF ¶ 15; PRDSMF ¶ 15; PSAMF ¶ 63; DRPSAMF ¶ 63.  Given that she knew her husband since childhood, Ms. Kimball believes that she was her husband's only sexual partner.  PSAMF ¶ 63; DRPSAMF ¶ 63.  Dr. Hower had at least six other sexual partners besides Ms. Kimball and an affair with another woman while he was romantically involved with her.  DSMF ¶¶ 5-8; PRDSMF ¶¶ 5-8; PSAMF ¶ 62; DRPSAMF ¶ 62.

Further, the record confirms that Dr. Hower had unprotected sex with at least two of his partners—Ms. Kimball and T.M.—during the same time period.  *See* DSMF ¶ 9; PRDSMF ¶ 9; PSAMF ¶ 59; DRPSAMF ¶ 59.  Although condoms are recommended as a method of preventing the transmission of STDs, Dr. Hower, a physician, said he was unaware of that recommendation.   DSMF ¶¶ 35, 38; PRDSMF ¶¶ 35, 38; PSAMF ¶¶ 39-40; DRPSAMF ¶¶ 39-40; *see Mussivand v. David*, 544 N.E.2d 265, 272 (Ohio 1989) (pointing out that where the defendant was a doctor "more than most people, [he] should be aware of the method of transmitting a venereal disease, its likelihood of spreading through sexual contact, and its potentially devastating effect").  In 2002, Ms. Kimball tested positive for HPV, which Dr. Hower stated she could "thank" him for.  PSAMF ¶ 64; DRPSAMF ¶ 64.

Although this evidence does not unequivocally establish causation, viewing the record in the light most favorable to Ms. Kimball and drawing all reasonable inferences in her favor, the Court concludes there is a genuine issue of material fact

regarding whether Dr. Hower's failure to take precautions to protect Ms. Kimball from HSV-2, such as wearing condoms, was the proximate cause of her infection. *See McIlroy*, 2012 ME 59, ¶ 8, 43 A.3d at 951 (stating that issues of causation should generally should go to the jury if any reasonable view of the evidence could establish a causal link); PSAMF ¶ 63; DRPSAMF ¶ 63. For the same reasons, these facts might also permit a reasonable juror to conclude that Ms. Kimball's HSV-2 infection was a direct result or a reasonably foreseeable consequence of Dr. Hower's failure to take steps to prevent transmission of the virus. *See Shaw*, 2000 ME 136, ¶ 10, 755 A.2d at 512.

As Ms. Kimball has generated genuine issues of material fact concerning Dr. Hower's duty to protect her from the transmission of HSV-2 and causation, the Court denies Dr. Hower's motion for summary judgment on Count I. *See Meany v. Meany*, 639 So. 2d 229, 235-36 (La. 1994) (upholding the jury's determination that the defendant was liable for transmitting genital herpes to the plaintiff, his ex-wife, based on an analysis of the parties' sexual histories, the defendant's extramarital affairs, and the likelihood that the defendant did not use condoms with some of his sexual partners).

### C. Count II: Negligent Infliction of Emotional Distress

In Count II of her Complaint, Ms. Kimball asserts a NIED claim against Dr. Hower. *Compl.* at 3-5. In his motion, Dr. Hower moved for judgment on this Count, asserting that Ms. Kimball had not established that she and Dr. Hower had the kind of special relationship Maine law requires for a NIED claim. *Def.'s Mot.* at 12-14. In her response, Ms. Kimball neglected to address whether she and Dr. Hower's

36

relationship was sufficiently "special" under Maine law. *Pl.'s Opp'n* at 1-17. She neither cites nor discusses any of the relevant caselaw on the issue. *Id.* Ms. Kimball's failure to address the issue justifies granting Dr. Hower's motion on Count II. *See Casillas-Diaz v. Officer Romualdo Palau,* 463 F.3d 77, 83 (1st Cir. 2006) (affirming litigants "unflagging obligation to spell out their contentions 'squarely and distinctly, or else forever hold [their] peace'" and concluding that the defendants waived their compensatory damages argument by making their argument "in a completely conclusory fashion" and failing "to apply the case law to the facts adduced at trial") (quoting *United States v. Zannino,* 895 F.2d 1, 17 (1st Cir. 1990)). Nevertheless, the Court will address the merits of the NIED claim.

Dr. Hower can only be held liable for NIED if he owed a duty to Ms. Kimball. *Curtis v. Porter*, 2001 ME 158, ¶ 18, 784 A.2d 18, 25. However, unlike traditional torts, Maine law does not use a foreseeability analysis to define duty in a negligent infliction of emotional distress claim; instead, whether a duty exists depends upon whether the plaintiff and defendant were in a special relationship for which the law imposes a duty. *Id.* In *Curtis*, the Law Court distinguished between intentional and negligent infliction of emotional distress torts, noting that the "titles of the two emotional distress torts can be misleading." *Id.* ¶ 17, 784 A.2d at 25. The two torts are "not distinguished merely by the level of intentionality extant in the conduct at issue." *Id.* Instead, the "universe of those who may be liable in tort for the **negligent** infliction of emotional distress is much more limited." *Id.* (emphasis in original). The *Curtis* Court explained:

> Plaintiffs claiming negligent infliction . . . face a significant hurdle in establishing the requisite duty, in great part because the determination of duty in these circumstances is not generated by traditional concepts of foreseeability. Although each person has a duty to act reasonably to avoid causing physical harm to others, there is no analogous general duty to avoid negligently causing emotional harm to others.

*Id.* ¶ 18, 784 A.2d at 25. The Maine Supreme Judicial Court has recognized "a duty to act reasonably to avoid emotional harm to others in very limited circumstances: first, in claims commonly referred to as bystander liability actions; and second, in circumstances in which a special relationship exists between the actor and the person emotionally harmed."[44] *Id.* ¶ 19, 784 A.2d at 25.

In *Bryan R. v. Watchtower Bible & Tract Society, Inc.*, the Law Court cited a series of commonly accepted special relationships which "based on the unique relationship of the parties" trigger a duty not to harm "the emotional well-being of another." 1999 ME 144, ¶¶ 30-32, 738 A.2d 839, 848-49. Some accepted special relationships include: the physician-patient relationship, psychotherapist-patient relationship, and the relationship between a hospital and a deceased patient's family members. *Id.* (citing cases). In *Estate of Cilley v. Lane*, the Law Court listed other examples of "special relationships [that] give rise to an affirmative duty to aid and protect, such as the relationship between a common carrier and passenger, employer and employee, parent and child, or innkeeper and guest." *Id.* 2009 ME 133, ¶ 17, 985 A.2d 481, 487. The Maine Superior Court extended the list to include

---

[44]     As the Law Court recognized in *Langevin v. Allstate Ins. Co.*, bystander status itself is a type of special relationship. 2013 ME 55, ¶ 15 n.7, 66 A.3d 585, 591 n.7 (The plaintiffs "did not plead bystander liability or some other special relationship"). However, this case does not involve an indirect victim. *Cf. Cameron v. Pepin*, 610 A.2d 279, 281-84 (Me. 1992).

an attorney-client relationship, *Angelica v. Drummond, Woodsum & MacMahon, P.A.*, No. CV-02-15, 2003 Me. Super. LEXIS 197, at *28 (Me. Super. Sept. 9, 2003), and the relationship between adoptive parents and an adoption agency, *Leroy v. Maine Children's Home*, No. CV-02-125, 2002 Me. Super. LEXIS 182, at *6-7 (Me. Super. Sept. 19, 2002). Nevertheless, as the First Circuit observed, the Maine Law Court "has proceeded cautiously in determining the scope of a defendant's duty to avoid inflicting emotional distress." *Veilleux v. Nat'l Broad. Co.*, 206 F.3d 92, 131 (1st Cir. 2000); *see Curtis*, 2001 ME 158, ¶ 21 n.18, 784 A.2d at 26 n.18 (no special relationship between a pizza delivery person and a customer); *Cilley*, 2009 ME 133, ¶¶ 3-7, 18-22, 985 A.2d at 483-84, 487-89 (no special relationship between an ex-boyfriend and ex-girlfriend); *Richards v. Town of Elliot*, 2001 ME. 132, ¶ 34, 780 A.2d 281, 293 (no special relationship between police officer and arrestee).

The Maine Supreme Judicial Court has addressed the difficult question of whether a sexual relationship may be a special relationship for purposes of a NIED claim. In *Bryan R.*, addressing a NIED claim against a church by an adolescent member of the church, claiming sexual abuse by an adult member of the church, the Law Court declined to designate the relationship between churches and their members as a special relationship or to carve out a general duty for the church to safeguard the psyche of its members. 1999 ME 144, ¶ 32, 738 A.2d at 848. By contrast, although addressing a negligent supervision claim, the Law Court in *Fortin v. Roman Catholic Bishop of Portland*, concluded that a church may owe a duty to prevent a child from being harmed by a priest when there is a close

39

connection between the church and child based on trust, vulnerability, and disparity of power.  2005 ME 57, ¶ 75, 871 A.2d 1208, 1232.  Similarly, in *Hinkely v. Baker*, the District Court concluded that a relationship between a teacher and a young child constituted a special relationship for purposes of a NIED claim.  122 F. Supp. 2d 48, 55-57 (D. Me. 2000).

Ms. Kimball has not cited and the Court has not found a case extending the special relationship for a NIED claim to a sexual relationship between consenting adults.  Although an adult who engages in a consensual sexual relationship usually trusts the other person, there is typically no special vulnerability or disparity of power that characterizes other relationships which have qualified for a NIED claim. As there is no qualifying special relationship under Maine law, the Court grants Dr. Hower's motion for summary judgment on Count II of the Complaint.

## IV.    CONCLUSION

The Court DENIES Dr. John Hower's Motion for Summary Judgment (ECF No. 37-1) on Count I insofar as it relates to Ms. Kimball's HSV-2 claim,  GRANTS Dr. Hower's motion on Count I as it relates to her HSV-1 claim, and GRANTS his motion on Count II.

SO ORDERED.

/s/ John A. Woodcock, Jr.
JOHN A. WOODCOCK, JR.
CHIEF UNITED STATES DISTRICT JUDGE

Dated this 21st day of August, 2013